IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAYMOND GLADDEN,

        Petitioner,                 No. CIV S-04-1866 FCD GGH P

    vs.

D.L. RUNNEL, et al.,

        Respondents.        FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was originally represented by attorney Frank Prantil.  Following Mr. Prantil's disbarment, attorney Eric Weaver was appointed to represent petitioner on September 1, 2006.

        Petitioner challenges his 1995 conviction for the first degree murder of Duane McBroome (Cal. Penal Code § 187), conspiracy to commit assault with a firearm on McBroome (Cal. Penal Code §§ 182, 245), conspiracy to commit extortion on McBroome (Cal. Penal Code §§ 182, 518), kidnaping for extortion of McBroome (Cal. Penal Code § 209(a)), and kidnaping of Robert Garcia (Cal. Penal Code § 207).  Petitioner is serving a sentence of life without the possibility of parole.

On August 4, 2006, respondent filed a motion to amend the answer to allege that the petition is barred by the statute of limitations pursuant to Evans v. Chavis, 546 U.S. 189, 126 S. Ct. 846 (2006).  For the following reasons, this motion should be denied.

Petitioner raises claims alleging ineffective assistance of counsel, jury instruction error, violation of his right to confrontation and insufficient evidence.  After carefully reviewing the record, the court recommends that the petition be denied.

II.  Motion to Amend

Fed. R. Civ. P. 15(a) provides, in relevant part,

(a) Amendments.  A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.  Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Factors to be considered when ruling on a motion to amend a habeas petition include bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether or not the party has previously amended his pleadings.  Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995).  Amendment may be disallowed if the amendment would be futile, such as where the amended matter is duplicative or patently frivolous, or where the pleading presents no new facts but only new theories and provides no satisfactory explanation for failure to fully develop the contentions originally.  Id.  Further, amendment may be prohibited in order to avoid a court's having to entertain piecemeal litigation or collateral proceedings advanced with a purpose to vex, harass or delay.  Franklin v. Murphy, 745 F.2d 1221, 1235-1236 (9th Cir. 1984).

In order to address respondent's motion, the court must discuss the merits of respondent's argument that the petition is barred by the statute of limitations.  This issue has been fully briefed by the parties in their pleadings relating to respondent's motion to amend the answer.

/////

2

1    The statute of limitations for federal habeas corpus petitions is set forth in 28

2  U.S.C. § 2244(d)(1):

3         A 1-year period of limitation shall apply to an application for a writ
          of habeas corpus by a person in custody pursuant to the judgment
4         of a State court.  The limitation period shall run from the latest of–

5         (A) the date on which the judgment became final by the conclusion
          of direct review or the expiration of the time for seeking such
6         review;

7         (B) the date on which the impediment to filing an application
          created by State action in violation of the Constitution or laws of
8         the United States is removed, if the applicant was prevented from
          filing by such State action;
9
          (C) the date on which the constitutional right asserted was initially
10        recognized by the Supreme Court, if the right has been newly
          recognized by the Supreme Court and made retroactively
11        applicable to cases on collateral review; or

12        (D) the date on which the factual predicate of the claim or claims
          presented could have been discovered through the exercise of due
13        diligence.

14        On January 13, 2000, the California Supreme Court denied petitioner's petition

15  for review.  Respondent's lodged document no. 17.  Petitioner's conviction became final 90 days

16  later on April 12, 2000.  Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("holding] that

17  the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the [ninety-day] period within

18  which a petitioner can file a petition for a writ of certiorari with the United States Supreme

19  Court, whether or not the petitioner actually files such a petition.").  Therefore, petitioner had

20  until April 12, 2001, to file a timely federal petition.  The instant petition, filed September 7,

21  2004, is untimely unless petitioner is entitled to statutory or equitable tolling.

22        Section 2244(d)(2) provides that the time during which a properly filed

23  application for State post-conviction or other collateral review with respect to the pertinent

24  judgment or claim is pending shall not be counted toward any period of limitation.  The court

25  now considers whether petitioner is entitled to tolling pursuant to § 2244(d)(2).

26  /////

1          On March 15, 2001, petitioner filed a habeas corpus petition in the Shasta County

2    Superior Court.  Respondent's Lodged Document no. 24a.  On December 19, 2002, the Shasta

3    County Superior Court denied the petition.  Id., no. 18f.  The Superior Court did not find that the

4    petition was untimely.  Id.  On April 8, 2003, petitioner filed a habeas corpus petition in the

5    California Court of Appeal.  Id., no. 19.  On May 15, 2003, the California Court of Appeal

6    denied the petition.  Id., no. 20.  The state appellate court did not find that the petition was

7    untimely.  Id.

8          On October 28, 2003, petitioner filed a habeas corpus petition in the California

9    Supreme Court.  Id., no. 21.  On September 1, 2004, the California Supreme Court denied the

10   petition.  Id., no. 22.  In the order denying the petition, the California Supreme Court cited five

11   cases: In re Swain, 34 Cal.3d 300, 304 (1949); People v. Deauville, 9 Cal.4th 464, 474 (1995); In

12   re Dixon, 41 Cal.2d 756 (1953); In re Lindley, 29 Cal.2d 709 (1947); In re Robbins, 18 Cal.4th

13   770, 780 (1998).  Id.

14          If petitioner is entitled to continuous tolling for the entire times his petitions were

15   pending in state court the instant action is timely.  Nino v. Galaxy, 183 F.3d 1003, 1006 (9th Cir.

16   1999) (the statute of limitations is tolled under 28 U.S.C. § 2254(d)(2) during the time properly

17   filed state post-conviction proceedings are pending, and that tolling applies from the time the

18   first state habeas petition is filed until the California Supreme Court rejects the petitioner's final

19   collateral challenge).

20          In Evans v. Chavis, supra, the Supreme Court held that in the absence of a clear

21   indication by the California Supreme Court that a petition is untimely, "the federal court must

22   itself examine the delay in each case and determine what the state courts would have held in

23   respect to timeliness."  Evans, 546 U.S. at ___, 126 S. Ct. at 852.

24          In the motion to amend, respondent argues that the petitions filed in the California

25   Court of Appeal and California Supreme Court are untimely pursuant to Evans.  Petitioner

26   waited 109 days from the time the Superior Court denied his habeas petition before filing his

4

1  petition in the California Court of Appeal.  Petitioner waited 166 days to file his petition in the

2  California Supreme Court after the state appellate court denied his petition.

3           For purposes of § 2244(d)(2), a petitioner is entitled to interval tolling only for

4  petitions that were timely filed under state law.  Evans, 546 U.S. at ___, 126 S. Ct. at 849.  In

5  most states, a statute sets forth a time period, such as 30 or 60 days, for the filing of a timely

6  appeal.  Id., 126 S. Ct. at 849.  Under California law, the notice of appeal is timely if filed within

7  a "reasonable time."  Id., 126 S. Ct. at 849 (citing In re Harris, 5 Cal. 4th 813, 828 n. 7, 21 Cal.

8  Rptr. 2d 373 (1993)).

9           In Evans, the Supreme Court stated that whether a state petition was timely under

10 California law must be decided on a case by case basis.  Id., 126 S. Ct. at 853.  The Supreme

11 Court also stated that even if a state court denies a habeas on the merits, this does not prove that

12 the state court thought the petition was timely.  Id., 126 S. Ct. at 850.

13          Respondent argues that petitioner's habeas petition filed in the state appellate

14 court was not timely because it was not filed within the 30 or 60 day time limit that most states

15 have.  The Supreme Court in Evans did not hold that the 30 or 60 day time limit of other states

16 governed the determination of whether petitions filed in California were timely.

17           In the absence of any such guidance, however, we see no alternative way of
             applying state law to a case like this one but for the Ninth Circuit simply to ask
18           and to decide whether the state prisoner made the relevant filing within a
             reasonable time.  In doing so, the Circuit must keep in mind that, in Saffold, we
19           held that timely filings in California (as elsewhere) fell within the federal tolling
             provision on the assumption that California law in this respect did not differ
20           significantly from the laws of the other States, i.e. that California's "reasonable
             time" standard would not lead to filing delays substantially longer than those in
21           States with determinate timeliness rules.

22 Id., 126 S. Ct. at 853.

23          At the time petitioner filed his petition in the state appellate court, the Ninth

24 Circuit had held in Saffold v. Carey, 312 F.3d 1031 (9th Cir. 2002), as amended on denial of

25 rehearing (Jan. 14, 2003), that a 4 ½ month interval did not constitute unreasonable delay.

26 Therefore, at the time he filed, petitioner did not act unreasonably in not filing his second petition

within 30 or 60 days of the date the Superior Court denied his first petition.  In other words, the state of the law describing what is reasonable/unreasonable at the time one acts, or fails to act, is an important factor when years later deciding the reasonableness of one's actions (after the law has changed).  Accordingly, the motion to amend on grounds that petitioner is not entitled to statutory tolling pursuant to Evans v. Chavis, supra, during the time his petition was pending in the California Court of Appeal is denied on grounds of futility.

Respondent goes on to argue that petitioner is not entitled to statutory tolling for the time his petition was pending in the California Supreme Court based on Evans.  The problem with this argument is that the California Supreme Court denied this petition by citing In re Robbins, which clearly indicates that the California Supreme Court found the petition untimely.  Therefore, Evans is not applicable as that case applies to situations where the California Supreme Court gives no clear indication that a petition is untimely.

Respondent goes on to argue that petitioner is not entitled to statutory tolling for the time his petition was pending in the California Supreme Court based on the Robbins citation pursuant to Pace v. DiGuglielmo, 544 U.S. 408, 125 S.C. 1807 (2005).  In Pace, the Supreme Court held that statutory tolling is not available for the period a petition is under consideration if it is dismissed as untimely.

The Supreme Court decided Pace on April 27, 2005.  Respondent's motion does not specifically seek leave to amend on grounds that the petition is barred by Pace.  In fact, respondent's motion does not address his delay in arguing Pace fifteen months after the Supreme Court decided this case.  Accordingly, the court finds that respondent has not shown good cause to grant the motion to amend on grounds that the petition filed in the California Supreme Court is barred pursuant to Pace.

For the reasons discussed above, the court recommends that respondent's motion to amend be denied.

/////

III.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

        The Antiterrorism and Effective Death Penalty Act (AEDPA)  applies to this

petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).   The AEDPA

"worked substantial changes to the law of habeas corpus," establishing more deferential

standards of review to be used by a federal habeas court in assessing a state court's adjudication

of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

(9th Cir. 1997).

        In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

between "contrary to" clearly established law as enunciated by the Supreme Court, and an

"unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

Court on a point of law, or (2) if the state court case is materially indistinguishable from a

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

        "Unreasonable application" of established law, on the other hand, applies to

mixed questions of law and fact, that is, the application of law to fact where there are no factually

on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

AEDPA standard of review which directs deference to be paid to state court decisions.  While the

deference is not blindly automatic, "the most important point is that an *unreasonable* application

of federal law is different from an incorrect application of law....[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

2   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

3   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

4            The state courts need not have cited to federal authority, or even have indicated

5   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

6   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

7   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

8   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

9   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

10  established Supreme Court authority reviewed must be a pronouncement on constitutional

11  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

12  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

13           However, where the state courts have not addressed the constitutional issue in

14  dispute in any reasoned opinion, the federal court will independently review the record in

15  adjudication of that issue.  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which we can determine whether a silent state

17  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18  2003).

19           When reviewing a state court's summary denial of a claim, the court "looks

20  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

21  F.3d 1072, 1079 n. 2 (9th Cir. 2000).  As to each claim, this court will discuss which state court

22  opinion is entitled to AEDPA deference.

23  /////

24  /////

25  /////

26  /////

IV.  Factual Background

Petitioner has adopted the factual summary contained in the opinion of the California Court of Appeal.  Petition, pp. 14-15.  Accordingly, the court will set forth this summary below.

**The Prosecution**

Most of the business and social relationships central to this case were developed in and around prison and drugs.  Prison presented networking opportunities for the business of dealing drugs.  Raymond Gladden, Mark Foley, and Jeff Train mark the exception; they knew each other since they were children growing up in Redding.  Gladden and Foley had been best friends since junior high school.  The friendship afforded Foley substantial discounts on drug purchases.

Foley met Duane McBroome in prison in 1987.  It was McBroome's first commitment and he had been put in a homosexual tank.  Foley helped him adapt to the prison culture and escape the homosexual attacks.  He thereafter thought of himself as McBroome's big brother.  Patrick Cummings, who was from southern California, met Gladden and Foley once at San Quentin on separate occasions.  Foley met Grant Robinson at San Quentin in 1993.  Marjorie Strain became good friends with Gladden about 1988, because he was a friend of her ex-husband.

The participants in this slice of the Redding drug culture were in and out of prison.  In the fall of 1993 Gladden was on parole and Foley and Cummings were serving time.  McBroome, a heavy drug user, was a parolee at large because of a dirty drug test.  He lived with his then girlfriend, Strain, in a car.  Strain sold drugs to support her addiction to heroin and methamphetamines.  Gladden, an enterprising dealer, lived with his grandmother in her trailer.  Everyone called her "Grandma."  Gladden often provided employment opportunities for recent parolees by extending credit for drugs they could then market for a profit.

McBroome and Strain went to Grandma's for an ounce of methamphetamine.  As was his custom, Gladden extended credit to them.  Although he was friends with Strain, Gladden dealt with McBroome in deference to McBroome's notion that the man, and not the woman, should take the lead in such matters.  Although they intended to sell the drugs for a profit and repay their $800 debt to Gladden, McBroome, putting pleasure before business, consumed the ounce of methamphetamine and later beat Strain when she confronted him about the unpaid debt.

Close relationships developed quickly in this milieu.  On December 31, 1993, DeeDee Butler, posted bail for Foley.  She had never met him before but posted bail for him at a mutual friend's request.  He began living with Butler and they became lovers.  He consumed a fifth of whiskey and used methamphetamines daily.  Foley, the middleman, obtained drugs from Gladden and gave them to Butler for distribution.  The sale of methamphetamine was Foley's only means of income.

1    Living arrangements for everyone, except Gladden and Grandma, remained fluid.
     Strain moved into Grandma's for a couple of weeks just after the first of the
2    year.  McBroome was jealous.  He went to the trailer and got into an argument
     with Gladden, accusing Gladden of having sex with Strain.  The argument
3    occurred with Grandma present.  She eventually ordered everyone off her
     property.  Gladden was angry that McBroome had been "disrespectful" in front of
4    Grandma and that he had failed to either pay his debt or make payment
     arrangements.  After Strain moved out and began living with another friend, she
5    gave Gladden title to her friend's truck as collateral for the debts.

6    On January 9 Foley was arrested by Redding police, at which time he swallowed
     an undisclosed amount of methamphetamine and was taken to the hospital.  When
7    unattended, he escaped.  He and Butler remained very mobile, sleeping in
     different hotel rooms and with different friends to avoid arrest.

8
     Sometime in mid-January, Gladden, Foley, Butler, Strain, and others got together
9    at Grandma's trailer. According to Butler and Strain, Foley "collected" for
     Gladden, that is, he encouraged Gladden's debtors to repay their loans and was
10   remunerated for his collection services in either cash or drugs.  On this occasion,
     he got a list of debtors, including McBroome, from Gladden.  Foley told Butler he
11   was looking for McBroome for Gladden.  He promised Strain that Gladden would
     give her back title and clear the drug debt if she would help him find McBroome.
12   Gladden stated that he wanted McBroome's "grille" (his front teeth) taken out.
     He asked Strain how to find McBroome to get the bill squared away. Although
13   she did not reveal his whereabouts, Gladden gave her another advance of
     methamphetamines.
14
     Grant Robinson was also using and dealing drugs in January 1994.  In mid-
15   January, Gladden asked Robinson to help Foley collect the debt from McBroome.
     He had a private conversation with Foley about collecting $1800 from
16   McBroome.  They drove around looking for him.  He testified that Foley generally
     carried a gun. When he had collected with Foley in the past, Foley had carried a
17   pistol.  On one occasion, they took a jet ski in repayment of a debt, but Gladden
     refused it.
18
     Enter Patrick Cummings, released from prison on January 25.  He stayed with
19   Terri Mueck, another drug user, and her two young daughters.  While he was at
     Mueck's, Strain and McBroome came over and they all traded jewelry.
20
     Because most, if not all, of these characters were using methamphetamines, and in
21   Strain's case, heroin as well, their memory for chronology is murky.  They were
     better able to remember a general sequence of events rather than to pinpoint
22   particular dates and times.  Our recitation of the facts often reflects this fogginess.
     Around January 26 or 27, Cummings arrived at Jeff Train's place with Foley.
23   Butler was the courier.  Foley asked Train, in front of Cummings, if he knew
     where McBroome was.  Train responded that McBroome had been making
24   himself scarce because he owed Train money for drugs.  Again, in front of
     Cummings, Train asked Foley if he planned on "soaking him up," but Foley just
25   smiled in response.

26   /////

                                    10

Again it is unclear precisely when, but sometime during the same two or three days, Foley and Cummings went to visit Bob Francis.  Although Cummings had never met Francis before, Cummings gave him some cash to enable Francis to buy drugs.  Cummings asked Francis if he knew McBroome.

Strain ran into Foley and Cummings at Francis's house.  She asked for their help in finding a gentleman called "Bubba," someone who had stolen drugs from her.  Foley agreed to help if she would disclose McBroome's whereabouts.  She also drove them to Mueck's.  Mueck was very upset because McBroome had stolen drugs from her.  They all stayed partying at Mueck's until the next morning when McBroome showed up with his cousin.  Cummings chased them in a truck, but lost them.

In the meantime, McBroome had complicated his life further by stealing drugs all around town and failing to repay his debts.  He began calling his mother several times a day begging for money.  He told her he would be killed if he did not pay, but since she had become accustomed to his lying and paranoia as a drug addict, she refused.  Nevertheless, she did drive him to Grandma's.  She heard Gladden tell her son he wanted him to stop avoiding him and to pay the debt.  They agreed a stereo could be used as a partial payment.

Strain was also fearful.  She called the police several times to get McBroome taken into custody because she was afraid he was going to be killed.  Moreover, since in Shasta County debts are quashed as a courtesy to a "homeboy" who goes to jail, Strain thought incarceration would solve many of McBroome's problems.  On January 30 Strain picked up Cummings in Mueck's.  Mueck was furious that McBroome had stolen drugs from her.  Cummings assured her it would be squared away.  At 4:15 a.m. the Redding police stopped Cummings, who claimed to be looking for McBroome to give him a ride.  Later that day, McBroome encountered Cummings and Strain at Shelley Cybert's.  Strain asked Cummings to keep McBroome away.  Cummings grabbed a tire iron or crow bar and chased McBroome off the property.

One month after Foley was released from prison and six days after Cummings was released, Duane McBroome was killed.  It was January 31, 1994.  The fatal event was triggered by a very odd coincidence.

Foley and Butler were staying at a Motel 6 before Butler took off for Texas with her children.  Strain and Cummings drove up, Cummings and Foley conversed in the parking lot, and then Strain and Cummings left together.  Meanwhile, Robert Garcia, McBroome's sister's boyfriend, was driving McBroome all around town, presumably negotiating various drug deals.

McBroome and Garcia were in the parking lot of an apartment complex about to culminate a drug sale, when they noticed a woman in the next parking stall struggling to open her door.  The woman was Butler.  Garcia and McBroome offered to help her but, just as they began, Foley pulled up and parked his borrowed car perpendicular to Garcia's.  Noticing McBroome, Foley yelled out his name and shouted, "Come here.  I want to talk to you."  Foley backed up toward Garcia's car.  When McBroome failed to respond, Foley stated, "I will cap you [shoot you] if I have to right here."  McBroome still refused to go with Foley.

11

Foley and McBroome got into Garcia's car.  Foley had a gun pointed at them.  He assured Garcia nothing would happen to him if he drove where he was told and that he was getting $1000 for taking McBroome to someone.

Foley directed Garcia to Mueck's hosue, but when they arrived Cummings was not there.  Garcia remained in his car as Foley and McBroome went into the house.  Foley asked Mueck and Butler to call Cummings.  Butler, pretending to be Mueck, told Cummings that Foley had McBroome at Mueck's.  Cummings said he would come over.

Eventually Garcia joined the others inside the house.  Foley, who was under the influence of methamphetamine, felt paranoid and held his gun in his lap.  They talked about old times in prison and shared methamphetamine.  Foley became angry when he perceived that Garcia was becoming too friendly with Butler.  The two were sitting on the couch together smoking marijuana.  They had also smoked or snorted methamphetamine with Foley and McBroome.  After Foley waved the gun at Garcia and yelled at him to stop "hitting on his old lady," Butler left and went to the store.

Cummings and Strain arrived after some time.  Strain and McBroome yelled and cursed at each other.  Foley and Cummings went into the kitchen.  Mueck, whose two daughters were asleep, asked Cummings to get everyone out of the house.  Foley and Cummings told the women to go into another room, Cummings picked up Foley's gun, and approached McBroome.  Garcia testified that Cummings walked up to McBroome and knocked him out of his chair with a hard blow to the head.  Before shooting him, Cummings hit him again.  Cummings then shot him.  Cummings then picked McBroome up, slammed him against the window, breaking it, and then threw him onto the ground, where he died.

Shock and panic ensued.  Strain was hysterical.  She left with Cummings.  They spent the night at Halverson's apartment.  Butler, who was driving, picked up Foley and while they were driving away, Foley threw the gun out the window.  They drove to Grandma's and woke up Gladden.  He told Butler to call local hospitals and to inquire about gunshot victims.  Gladden and Foley talked in another room.  Garcia went to a friend's house but did not call the police.

The following morning, Cummings and Halverson returned to Mueck's to remove and transport the corpse in a borrowed Cadillac.  Halverson went through McBroome's pockets and removed cash and a woman's ring.  They wrapped the body in a shower curtain and put it into the trunk.  Cummings later disposed of it.  Mueck cleaned the house but blood stains remained and the family moved out.

Cummings and Strain then went to Grandma's to tell Gladden what happened.  Cummings and Gladden talked privately.  Gladden temporarily terminated his business relationship with Strain but told her the debt was quashed and everything was even.  He gave Cummings and Strain drugs and cash for lodging.

On February 2 Mueck packed Cummings personal belongings pursuant to his request and took them to a safe place in Chico.  Cummings borrowed Halverson's car again.  At approximately 3 a.m. the following day a fire was set at the Mueck residence.  There was no shower curtain in the bathroom, there was a melted

12

plastic material on the carpet, and there was a blood-stained towel in the laundry area.  Cummings told Halverson he torched the house and had taken care of the shower curtain.

Later that afternoon a motorist found McBroome's body.  The cause of death was a single gunshot wound to the chest caused by a small caliber bullet.  He had a toxic, but not fatal, level of methamphetamine in his body.  There were no observable bruises or lacerations on his face, but there were abrasions to the back of his right hand consistent with defensive wounds.  Cummings was arrested the same day.

Foley was very concerned about Robert Garcia.  He told Butler he wanted to go back and "take care" of him to make sure he did not talk.  Foley told Francis he "was going to have to find him and find a chest to put him in" and that because Garcia had been a witness to the murder he had to "off him."

Foley met with Gladden about four times after McBroome's death.  Gladden paid for Foley's and Strain's lodging and gave Foley drugs.  He also wired him cash.  Foley talked to Gladden about ten times on the telephone.  Foley and Gladden were arrested in the middle of March.

**The Defense**

The defendants attacked the credibility of the prosecution's star witnesses, who happened to be their former girlfriends, their friends, or their business associates.  They point out that each of the so-called percipient witnesses abused drugs over a prolonged period of time and Garcia, Butler, Mueck, and Halverson were under the influence of methamphetamine at the time of the shooting.  Strain, under the influence of both methamphetamine and heroin when McBroome was shot, had been up for two days.

They also argued many of the witnesses had disincentives to testify truthfully.  Strain, Mueck, Robinson, and Halverson all testified for the prosecution under grants of immunity.  Butler testified for the prosecution in exchange for dismissal of some of the charges against her and a guarantee that she would not be sentenced to more than twelve years.

Foley and Cummings both testified; Gladden did not.  While their stories for the most part were consistent with each other, they were at odds with the testimony of the prosecution's witnesses in many crucial respects.  Cummings testified he had an amiable relationship with McBroome in the very short time he knew him.  He met McBroome the day after he was released from prison at Mueck's house and traded methamphetamine for two rings and a necklace.  He saw McBroome again a few days later at Shelly Cypert's house.  Cummings asked McBroome about the drugs he had taken from Mueck.  McBroome apologized and gave Cummings $25 for Mueck.  McBroome asked if Cummings was having sex with Strain.

Cypert and a neighbor testified they saw Cummings calmly talking to McBroome over the fence.  He was not holding a tire iron and when he came back inside, he was very pleasant and seemed to be in a good mood.

13

Cummings also disputed much of the testimony about the events immediately preceding the shooting.  He testified that Strain insisted on accompanying him to Mueck's house under the pretense that she could keep everything under control, but as soon as she arrived she began shouting and cursing at McBroome.  As the argument escalated, Foley began shooting up drugs and Mueck insisted that everyone leave.  Cummings picked up Foley's gun because he did not know anyone very well and he was concerned about how they might behave since they were under the influence of methamphetamines.  When he walked over to McBroome, McBroome jumped up from his chair and grabbed Cummings by the shirt and the mustache.  The gun discharged accidentally during the scuffle.

Cummings claimed he tried to discourage Halverson from pillaging the body.  He also testified he did not meet with Gladden until after the shooing and he denied setting the fire at the Mueck residence.

Foley also testified to motives toward McBroome, very different from those portrayed by the prosecution.  He emphasized he had taken care of McBroome in prison and viewed him as his "little brother."  Having heard from multiple sources that McBroome had stolen drugs from dealers and friends, Foley wanted to talk to him and help him out.  He was aware of McBroome's debt to Gladden, but did not intend to collect on it.  Although he admitted he had done drug collections in the past, he denied collecting for Gladden or anyone after his release from prison on December 31.  He simply wanted to encourage McBroome to contact Gladden to make arrangements for repayment of the debt.  He never went looking for McBroome, but he would ask people if they had seen him.  Moreover, he asserted that Gladden had never asked him to take McBroome's "grille" out as alleged by Strain but that Gladden had warned that if McBroome returned causing problems he was "going to knock his grille out."

He denied forcing McBroome and Garcia to get into the car at gunpoint.  They agreed to go to Mueck's house to discuss with Cummings whether McBroome's debt Mueck had been repaid and to assure McBroome that Cummings was not "screwing" Strain.  When he was not there, Foley asked Butler and Mueck to call him and ask him to come over.  He also attested to the accidental nature of the shooting and testified her previously had shot himself in the butt with the same gun when it accidentally discharged.

Cummings, according to Foley, gave him the gun and told him he would call an ambulance.  Foley left in a panic.  He threw the gun out the window of the car.  The defense also put on witnesses who were familiar with the etiquette and business practices in the Redding drug world.  They testified that violence was not used to collect drug debts.  Violence was unnecessary because the worst threat to an addict is to lose his or her supplier.  Moreover, violence would attract law enforcement which was not good for business.

Respondent's February 23, 2005, lodged document no. 4, pp. 3-14.

/////

/////

14

V.  Discussion

The petition is somewhat disorganized.  It appears to the court that petitioner's claims begin on page 19, with the preceding pages containing a preliminary statement.

A.  Jury Instruction Error

*Legal Standard*

A challenge to jury instructions does not generally state a federal constitutional claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct. at 482.

Where, as in the present case, what is at issue is the failure to give an instruction, petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a due process violation.  Id.

The burden upon petitioner is greater yet in a situation where he claims that the trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

1  duty to give an instruction <u>sua</u> <u>sponte</u> under rules of state law, petitioner has stated no federal

2  claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

3  Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

4  claim whatsoever.  <u>James v. Reece</u>, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

5  violate due process, the impact on the proceeding from failure to give an instruction <u>sua</u> <u>sponte</u>

6  must be of a very substantial magnitude.

7          Furthermore, the Supreme Court has recently held that there is no unreasonable

8  application of federal law where a state appellate court decided that a jury instruction's single

9  incorrect statement of the "imperfect self-defense" standard did not render the instruction

10  reasonably likely to have misled the jury.  <u>Middleton v. McNeil</u>, 541 U.S. 433, 124 S.Ct. 1830

11  (2004).

12              *Aiding and Abetting Instructions*

13          No state court issued a reasoned decision addressing this claim.  Accordingly, the

14  court independently reviews the record to determine whether the denial of this claim by the

15  California Supreme Court, in its summary denial of petitioner's habeas corpus petition, was an

16  unreasonable application of clearly established Supreme Court authority.  <u>See</u> Respondent's

17  Lodged Documents No. 21 (petition for writ of habeas corpus filed in California Supreme Court)

18  and 22 (summary denial of habeas corpus petition by California Supreme Court).

19          Petitioner first argues that the aiding and abetting instructions were

20  constitutionally defective because 1) they failed to define the target offense; and 2) the

21  instruction on the "natural and probable consequences doctrine" was erroneous.  Petition, p. 19.

22  The jury was instructed regarding aiding and abettor liability, in relevant part, as follows:

23              One who aids and abets is not only guilty of the particular crime that his
            confederates are contemplating committing, but he–he is also liable for the natural
24          and probable consequences of any criminal act that he knowingly and
            intentionally aided and abetted.  You must determine whether the defendant is
25          guilty of the crime originally contemplated, and if so, whether the crime charged
            was a natural and probable consequence of such originally contemplated crime.

26

1   RT at 4737.

2          In Solis v. Garcia, 219 F.3d 922 (9th Cir. 2000), the petitioner challenged his

3   second degree murder conviction on grounds that the instructions given failed to instruct on the

4   elements of the target crime he was alleged to have committed as an aider and abettor.  In Solis,

5   as in the instant case, the natural and probable consequences instruction did not identify any

6   target offense.  219 F.3d at 926.  The Ninth Circuit found the instructions were adequate because

7   they mirrored each element of second degree murder under the doctrine of natural and probable

8   consequences as defined by the California Supreme Court:

9              This is not a Winship-type case, however, because the instruction did not omit any
               element of the second degree murder charge against Solis.  The elements of the
10             crime of second degree murder that Solis was charged with are (1) knowledge of a
               confederate's unlawful purpose; 2) intent to commit, encourage, or facilitate the
11             commission of any target crime; (3) aid, promotion, encouragement, or instigation
               of the target crime; (4) commission by defendant's confederate of the charged
12             crime; and (5) the offense committed by the confederate was a natural and
               probable consequence of the target crime that the defendant encouraged or
13             facilitated.  People v. Prettyman, 14 Cal.4th 248, 58 Cal.Rptr.2d 827, 926 P.2d
               1013, 1027 (1996).  We accept, as we must, the California Supreme Court's
14             identification of the elements of the offense.

15   219 F.3d at 927.

16          In the instant case, the crimes from which aider and abettor liability could have

17   arisen were defined for the jury:  assault with a deadly weapon, see respondent's lodged

18   document 26, CT 1552, kidnaping for robbery, id. at 1563 and kidnaping for extortion, id. at

19   1562.  Accordingly, pursuant to Solis, the instructions given were constitutionally adequate.  The

20   instruction in this case advised the jury that in order for aiding and abetting to occur, they had to

21   find that he (1) knowingly and intentionally aided the contemplated crime(s), (2) was guilty of

22   the contemplated crime(s), and (3) that the charged crime [murder during the course of a

23   kidnaping] was the natural and foreseeable consequence of the underlying charged crimes

24   [kidnaping for robbery or extortion and assault with a deadly weapon].  Petitioner does not allege

25   that the elements of the underlying contemplated crimes were not set forth before the jury.  All of

26   the Solis requirements are sufficiently present here for no constitutional error to have occurred.

17

1  Moreover, <u>Solis</u> on the merits (as opposed to the COA determination) was a pre-AEDPA case

2  having been filed in the district court in 1995.  Petitioner would now have to show that in aiding

3  and abetting situations the Supreme Court of the United States has required that all target crimes

4  be specifically identified in the specific aiding and abetting instruction.  No direct or indirect

5  holding of the Supreme Court requires such.  Indeed, if the application standard is that petitioner

6  must show a likelihood that the jury was confused by the aiding and abetting instruction,

7  <u>Middleton</u>, <u>supra</u>, he has not done so.

8            After independently reviewing the record, the court finds that the California

9  Supreme Court's denial of this claim was not an unreasonable application of clearly established

10  Supreme Court authority.  Accordingly, this claim should be denied.

11            *Failure to Instruct re: When a Kidnap Ends*

12            The California Court of Appeal was the last state court to issue a reasoned

13  decision denying this claim.  Respondent's lodged document 4.  Accordingly, the court considers

14  whether the denial of this claim by the California Court of Appeal was an unreasonable

15  application of clearly established Supreme Court authority.  <u>Shackleford v. Hubbard</u>, 234 F.3d

16  1072, 1079 n. 2 (9th Cir. 2000).

17            Petitioner argues that the trial court failed to sua sponte instruct the jury on when a

18  kidnaping ends. Petition, p. 23.  The California Court of Appeal rejected this claim:

19  
20  
> Relying on <u>People v. Pearch</u> (1991) 229 Cal.App.3d 1282, defendants contend the trial court committed reversible error by failing to instruct the jury sua sponte on when a kidnapping ends.  We disagree with the dictum in <u>Pearch</u> upon which the defendants rely.

21  
22  
23  
24  
25  
> The court reversed the judgment in <u>Pearch</u> on an unrelated issue but offered advice to the trial court in the event of a retrial.  It advised the defendants to request the court to instruct the jury on their theory the kidnapping had ended before the victim was killed.  (<u>Id</u>. at p. 1299.)  Concluding the opinion, the court also added: "Even if [defendants] do not affirmatively request such an instruction, the court should instruct on when a kidnapping ends if [defendants] rely on a defense that even if [the victim] had been kidnapped from his trailer initially, the kidnapping had ended before he was killed."  (<u>Ibid.</u>)

26  \\\\\

1
2
3
4
5

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case [Citation.]" (People v. Ochoa (1998) 19 Cal.4th 353, 422, internal quotation marks omitted.)  The trial court does not have an obligation to clarify an instruction or pinpoint how the evidence relates to the instructions given.

6
7
8
9

We conclude that an instruction on when a kidnapping ends is in the nature of a clarifying or pinpoint instruction.  The jury was instructed on each of the elements of kidnapping and such important nuances as the achievement of the purpose for robbery or extortion is not essential to the crime (CALJIC 9.5), there is no kidnapping when the purported victim consents to accompany the defendant (CALJIC 9.56),and a reasonable and good faith belief the purported victim consented is a defense to a kidnapping charge (CALJIC 9.58).  These issues were closely and openly connected with the facts and the law before the jury.

10
11
12
13
14

In an analogous case in which a defendant contended on appeal the court had failed to provide a modification to the instructions on aiding and abetting, the court concluded: "'The modification suggested...constitutes a clarification of the jury's fact-finding responsibility, not the delineation of an element of a crime or a form of criminal liability...That is, as worded, the instruction does not withdraw an element from the jury's determination or otherwise interject an impermissible presumption into the deliberative process. [¶] Under such circumstances, we require the defendant to request further instructional application or explanation as he deems necessary. [Citation.]'" (People v. Escobar (1996) 48 Cal.App.4th 999, 1020.)

15
16
17
18
19

The same is true here.  The jury was properly instructed on the elements of the offense, including amplification of the finer points of law.  The defendants certainly had the right to request an instruction pinpointing the moment in time the kidnapping ended.  The duration of the kidnapping was, of course, relevant to a determinating as to whether a killing was committed in furtherance of the conspiracy to kidnap.  But absent such a request, we do not believe the court had the obligation sua sponte to construct a potential time line.  The defendants, not the court, have the burden to propose such an instruction.

20   Respondent's February 23, 2005, lodged doc. no. 4, pp. 35-37.

21          For the reasons stated by the California Court of Appeal, the court finds that the

22   trial court's failure to sua sponte instruct the jury as to when a kidnaping ends did not violate

23   fundamental fairness.

24          As observed by respondent, the apparent factual basis for petitioner's claim is

25   DeeDee Butler's testimony that it seemed that McBroome wanted to stay at the Mueck residence

26   and take care of business.  Foley also testified that McBroome freely accompanied him from the

19

1    start.  Respondent correctly observes that if that were true, then CALJIC 9.56, given in this case,

2    would have provided a basis for refuting the evidence of an ongoing kidnaping because the

3    victim's frame of mind would have been one of consent:

4          When one consents to accompany another, there is no kidnapping so long as such
         condition of consent exists.

5

6          To consent to an act or transaction, a person must
         1.  Act freely and voluntarily and not under the influence of threats, force or
         duress;

7          2.  Have knowledge of the true nature of the act or transaction involved; and
         3.  Possess sufficient mental capacity to make an intelligent choice whether or not

8          to do something proposed by another person.
         Mere passivity does not amount to consent.  Consent requires free will and

9          positive cooperation in act or attitude.

10    Respondent's Lodged Document No. 26, Volume 6, CT at 1566.

11          CALJIC NO. 9.56 provided a basis for the jury to determine whether McBroome

12    stayed at the Mueck's house freely and voluntarily or under the influence of threats, force or

13    duress.

14          Respondent also observes that there was plenty of evidence demonstrating that

15    McBroome did not feel free to leave the Mueck house.  Robert Garcia testified that McBroome

16    was scared at the Mueck residence:

17          Q: What else did you see?

18          A: As far as everything, I just–I just seen them talking about the situation at hand,
         about what Duane was there for, which was some kind of debt, I believe.

19          Watching the people, TV and talking to DeeDee.  Just basically trying to–I was
         basically trying to make myself easy for me.

20

21          Q: What do you mean easy for you?

22          A: Everything was, you know, at stress because the gun was there and Duane was
         nervous obviously.  And it was just a lot of stress there.

23          *****

24          Q: Where was the gun?

25          A: His hand.

26          Q: And when you say it was in his hand, was it directed at anyone?

1   A: At the time towards Duane.  And when he talks to me, it was toward me.  But it was to whoever his attention was at, but basically Duane.

2

3   Q: What happened next?

    A: We waited until Patrick got there and after awhile, he did get there.  And Marjorie was with him which, was Duane's girlfriend–ex-girlfriend at the time.

4   And they came in and they–Mark didn't–Patrick started talking and that's–

5

6   Q: What happened next?

    A: Mark and Patrick were talking. And then Patrick kind of looked at Duane

7   sternly and scaring him.

8   Q: What do you mean?

9   A: He was a big guy.  I mean he was looking at Duane like we got you.

10  Attorney Papendick: Objection to the conclusion of the witness.

11  Court: Sustained.

12  Attorney Papendick: Motion to strike.

13  Court: Granted.

14  Q: Can you describe for us what you saw?

15  A: I said, "Pat, did you get there to conversate with Mark?"  And just–he went to walk–he talked to Terri I believe, for a while.

16

    Q:  I'm sorry.  When you say that Patrick was looking at Duane sternly, what did
17  you actually see that made you think that?

18  A: He glared at him eye-to-eye.  You could tell by the expression on Duane's face. I seen his face and he was threatened, scared.

19

20  Respondent's Lodged Document 23, Volume 3, RT at 585-587.

21          Garcia also testified that it did not appear that McBroome was free to leave the

22  Mueck residence:

23  Q: And did it appear to you whether Duane McBroome was free to leave?

24  A: No, he wasn't free to leave.

25  Q: How could you tell?

26  A: He had a gun pointed to him and Mark–at one point, Mark–Duane was towards

21

1              the door.  He sat next to the door and Mark said, "Don't you think about leaving."

2              And Duane said, "I'm not." And then he ended up back to the seat where he was, which was towards the back of the house.

3   Id., RT at 597.

4           Garcia's testimony, as well as the other evidence presented regarding how and

5 why McBroome got to the Mueck residence was strong evidence that McBroome was not free to

6 leave the Mueck residence.  Under these circumstances, an instruction regarding when a

7 kidnaping ends would not have changed the outcome of the trial.

8           The denial of this claim by the California Court of Appeal was not an

9 unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

10 should be denied.

11                  *Failure to Instruct re: Conspiracy to Commit Theft*

12           No state court issued a reasoned decision denying this claim.  Accordingly, the

13 court independently reviews the record to determine whether the denial of this claim by the

14 California Supreme Court, in its summary denial of petitioner's habeas corpus petition, was an

15 unreasonable application of clearly established Supreme Court authority.  See Respondent's

16 Lodged Documents No. 21 (petition for writ of habeas corpus filed in California Supreme Court)

17 and 22 (summary denial of habeas corpus petition by California Supreme Court).

18           Petitioner asserts that the prosecution's theory was that he conspired with Foley to

19 kidnap for the purpose of extortion, and that McBroome was killed during the course of a kidnap

20 for purpose of extortion.  Petition, p. 24.  Petitioner argues that the evidence also supported the

21 theory that the alleged conspiracy with Foley was for purposes of theft.  Id.  Petitioner argues that

22 the trial court should have sua sponte instructed the jury as to conspiracy to commit grand theft.

23 Id.

24           "Extortion is the obtaining of property from another, with his consent...induced by

25 a wrongful use of force or fear, or under color of official right."  Cal. Penal Code § 518.  Robbery

26 is the taking of personal property in the possession of another, from the person or immediate

1   presence, and against the will, accomplished by means of force or fear.  Cal. Penal Code § 211.

2   Where the elements of force or fear are absent, a taking from the person is grand theft, a lesser

3   included offense of robbery.  Cal. Penal Code § 487(2); People v. Morales, 49 Cal. App. 3d 134,

4   139, 122 Cal. Rptr. 157 (1975).

5          The record contained no evidence that petitioner and Foley conspired to take

6   personal property from McBroome without the use of force or fear.  Rather, the evidence

7   demonstrated that Foley told McBroome in the parking lot that he had to go with him or be shot.

8   When they arrived at Mueck's house, Foley held his gun on his lap.  This evidence did not

9   support a jury instruction for grand theft.  Accordingly, the trial court did not err in failing to give

10  this instruction.

11         After independently reviewing the record, the court finds that the denial of this

12  claim by the California Supreme Court was not an unreasonable application of clearly established

13  Supreme Court authority.  Accordingly, this claim should be denied.

14                    *Failure to Instruct re: Kidnap for Purpose of Grand Theft*

15         No state court issued a reasoned decision denying this claim.  Accordingly, the

16  court independently reviews the record to determine whether the denial of this claim by the

17  California Supreme Court, in its summary denial of petitioner's habeas corpus petition, was an

18  unreasonable application of clearly established Supreme Court authority.  See Respondent's

19  Lodged Documents No. 21 (petition for writ of habeas corpus filed in California Supreme Court)

20  and 22 (summary denial of habeas corpus petition by California Supreme Court).

21         Petitioner argues that the trial erred by failing to sua sponte instruct the jury on the

22  lesser charge of kidnap for the purpose of grand theft.  Petition, p. 25.  As observed by

23  respondent, California does not have a separate offense of kidnaping for the purpose of

24  committing grand theft.  Rather, kidnaping for other than a felony named in Cal. Penal Code §

25  290 is "simple" kidnaping, which does not require an underlying purpose.  See Cal. Penal Code

26  §§ 290, 207.  In the instant case, the jury was instructed as to simple kidnaping.  Respondent's

1   Lodged Document No. 26, Volume 6, CT at 1561.  For these reasons, the court finds that this

2   claim is without merit.

3          After independently reviewing the record, the court finds that the denial of this

4   claim by the California Supreme Court was not an unreasonable application of clearly established

5   Supreme Court authority.  Accordingly, this claim should be denied.

6                    *Failure to Instruct re: Voluntary Manslaughter*

7          No state court issued a reasoned decision addressing this claim.[1]  Accordingly, the

8   court independently reviews the record to determine whether the summary denial of this claim by

9   the California Supreme Court in its order denying petitioner's petition for review was an

10  unreasonable application of clearly established Supreme Court authority.  Respondent's Lodged

11  Documents 13 (petition for review) and 17 (summary denial of petition for review by California

12  Supreme Court).

13         Petitioner argues that the trial court should have sua sponte instructed the jury as

14  to voluntary manslaughter under a heat of passion theory.  Petition, p. 25.  Petitioner argues that

15  the evidence reasonably supported that McBroome was killed in the heat of passion.

16         Manslaughter is a lesser included offense of murder.  People v. Manriquez, 37

17  Cal.4th 547, 583 (2005).  The Supreme Court has held that, in capital cases, a trial court's failure

18  to instruct the jury on a lesser offense if there is evidence to support that instruction amounts to

19  constitutional error.  Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382 (1980).  The Supreme

20  Court has remained silent on whether Beck applies to non-capital cases.  Because there is no

21  clearly established Supreme Court authority on issue, petitioner is not entitled to relief as to this

22  claim.

23  \\\\\

24

_____

25         [1] In its reasoned decision, the California Court of Appeal addressed co-defendant
    Cummings claim that the failure to give the manslaughter instruction violated state law.
26  Respondent's Lodged Document No. 4, pp. 29-33.

1    The court observes that while criminal defendants are entitled to adequate

2    instructions on their theory of defense, <u>Bashor v. Risley</u>, 730 F.2d 1228 (9th Cir. 1984),

3    petitioner's theory of defense was not that McBroome was killed in the heat of passion.

4    Petitioner's counsel argued that there was no evidence of an agreement between petitioner or

5    anyone to take anything from McBroome.  RT at 4820.  Petitioner's defense was not that he

6    asked Foley to collect a drug debt and that things got out of hand.  Had it been, then an

7    instruction regarding manslaughter may have been appropriate had petitioner requested it.

8    Because this was not petitioner's defense, the trial court did not err in failing to sua sponte

9    instruct the jury as to voluntary manslaughter.

10    After independently reviewing the record, the court finds that the denial of this

11    claim by the California Supreme Court was not an unreasonable application of clearly established

12    Supreme Court authority.  Accordingly, this claim should be denied.

13                    *Failure to Instruct re: Perfect or Imperfect Self-Defense*

14    No state court issued a reasoned decision denying this claim.  Accordingly, the

15    court independently reviews the record to determine whether the denial of this claim by the

16    California Supreme Court, in its summary denial of petitioner's habeas corpus petition, was an

17    unreasonable application of clearly established Supreme Court authority.  <u>See</u> Respondent's

18    Lodged Documents No. 21 (petition for writ of habeas corpus filed in California Supreme Court)

19    and 22 (summary denial of habeas corpus petition by California Supreme Court).

20    Petitioner's argument in support of this claim is as follows:

21    GLADDEN contends that there was sufficient evidence for the trial court to
       instruct sua sponte on the defense theories of perfect and imperfect self-defense.

22

23    The trial court's failure to so instruct violated due process because the failure
       lightened or shifted the prosecution's burden of proof to prove al the elements of
       the charge beyond a reasonable doubt.

24

25    Petition, p. 26.

26    \\\\\

25

Petitioner cites no portion of the record to support his claim that there was
sufficient evidence for the trial court to sua sponte instruct on the defense theories of perfect and
imperfect self-defense.  Nor does petitioner cite any legal authority in support of this claim.
Because this claim is vague and conclusory, the court finds that it has no merit.  See James v.
Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a
statement of specific facts do not warrant habeas relief.").

After independently reviewing the record, the court finds that the denial of this
claim by the California Supreme Court was not an unreasonable application of clearly established
Supreme Court authority.  Accordingly, this claim should be denied.

*Kidnap for Extortion Instructions*

Petitioner argues that the trial court erred in instructing the jury on kidnap for
extortion on grounds that there was no evidence to support this instruction.  Petition, p. 26.
Petitioner argues that there was no evidence establishing a second victim from whom Foley was
attempting to extort the debt.

This claim is really a challenge to the sufficiency of the evidence, which petitioner
separately raises.  Accordingly, the court will address this claim in the section addressing his
sufficiency of evidence claims.

*CALJIC 8.75*

No state court issued a reasoned decision denying this claim.  Accordingly, the
court independently reviews the record to determine whether the denial of this claim by the
California Supreme Court, in its summary denial of petitioner's habeas corpus petition, was an
unreasonable application of clearly established Supreme Court authority.  See Respondent's
Lodged Documents No. 21 (petition for writ of habeas corpus filed in California Supreme Court)
and 22 (summary denial of habeas corpus petition by California Supreme Court).

Petitioner argues that the trial court improperly instructed the jury that it could not
accept a verdict to any of the lesser charges unless it unanimously found that petitioner was not

guilty beyond a reasonable doubt of the greater charges, i.e. CALJIC 8.75:

> If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond reasonable doubt that he is guilty of such crime.
>
> You will be provided with guilty and not guilty verdict forms for the crime of murder in the first degree and the lesser crimes thereto.  Murder in the second degree is a lesser crime to that of murder in the first degree.  Involuntary manslaughter is lesser to that of murder in the second degree.
>
> Thus,...you are to determine whether the defendant is guilty or not guilty of murder in the first degree or any lesser crime thereto.  In doing so you have the discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it.  You may find it to be productive to consider ane each tentative conclusions on all charged and lesser crimes before reaching any final verdicts.

Respondent's Lodged Document 23, Volume   , RT at 4752-54.

In <u>United States v. Jackson</u>, 726 F.2d 1466, 1469 (9th Cir. 1984), the court refused to find that an "acquittal first" instruction violated due process, at least where a defendant had not expressed an objection. This case highlights the fact that there is no Supreme Court case applicable to petitioner's contention.

The denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

## B.  <u>Ineffective Assistance of Counsel</u>

*Legal Standard*

The test for demonstrating ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  <u>Id</u>. at 690, 104 S. Ct. at 2066.  The federal court must then determine

27

whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

1   <u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

2          *Analysis*

3          Petitioner raised his ineffective assistance of counsel claims in his state habeas

4   corpus petitions.  The Shasta County Superior Court was the last state court to issued a reasoned

5   decision addressing these claims.  <u>See</u> Respondent's Lodged Documents 18(f)(reasoned opinion

6   of Superior Court) and 22 (summary denial of habeas corpus petition by California Supreme

7   Court).  Accordingly, the court considers whether the denial of these claims by the Superior

8   Court was an unreasonable application of clearly established Supreme Court authority.

9   <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

10          Petitioner raises five claims of ineffective assistance.  First, he alleges that counsel

11   was ineffective for failing to request jury instructions for conspiracy to commit theft and kidnap

12   for grand theft.  Petition, p. 29.  As discussed above, the evidence did not support a jury

13   instruction for theft.  Also, as discussed above, California does not have a separate offense of

14   kidnaping for the purpose of committing grand theft.  Therefore, counsel was not ineffective for

15   failing to request these instructions.   The denial of these claims by the Superior Court was not an

16   unreasonable application of clearly established Supreme Court authority.

17          Petitioner next argues that counsel was ineffective for failing to request an

18   instruction defining when a kidnaping ends.  Petition, p. 29.  In support of this claim, petitioner

19   cites the opinion of the California Court of Appeal:

20          There was evidence to suggest the kidnapping, if any, had ended. The jury was
            free to accept the evidence that Garcia voluntarily joined Foley, McBroome, and
21          the others inside the house wherein a social gathering had convened and
            McBroome also voluntarily stayed to enjoy the drugs.
22

23   Respondent's Lodged Document No. 4, p. 31.

24          The Court of Appeals' comments were made in the section of the opinion

25   addressing co-defendant Cummings' claim that there was evidence to support a manslaughter

26   instruction.  Earlier in its opinion, the California Court of Appeal found that there was ample

1   evidence that the kidnaping had not ended when McBroome was killed:

2           Cummings makes a fatal factual leap.  He asserts the kidnapping, if there was one,
        was clearly ended before the killing occurred.  The jury, however, found
3       otherwise.  While we will discuss the kidnapping conviction at greater length
        below, there is ample evidence to support the jury's finding the kidnapping
4       continued up and until Cummings shot and killed the victim.

5   Id., p. 18.

6           As discussed above, this court also found that substantial evidence was presented

7   that McBroome was not free to leave the Mueck residence.  For this reason, it is unlikely that the

8   outcome of the trial would have been different had counsel requested an instruction defining

9   when a kidnaping ends.  Accordingly, petitioner was not prejudiced by counsel's failure to

10  request this instruction.  The denial of this claim by the Shasta County Superior Court was not an

11  unreasonable application of clearly established Supreme Court authority.

12          Petitioner next argues that counsel was ineffective for failing to argue that

13  McBroome's death did not occur during the course of the alleged kidnaping.  Petition, p. 30.  The

14  Shasta County Superior Court rejected this claim as follows:

15          Petitioner's counsel chose to attack the weaker, i.e. more difficult to prove,
        argument, that petitioner was responsible for the actions of Foley and
16      [Cummings].  To ask him to attack the existence of the kidnap, in light of the
        tenor of the case at trial would be as though asking him to argue a variation of the
17      classic, "My client wasn't there, and even if he was, did not do it."  Petitioner's
        counsel would have had to argue that, "Petitioner did not request it, but if he did,
18      it did not happen."  Trial counsel's tactical decision was well founded in light of
        the circumstances of the case at trial, and as such, is not an error, it if ever were, to
19      be reversed.

20  Respondent's Lodged Document 18f, p. 4.

21          This court agrees with the reasoning of the Superior Court that counsel was not

22  ineffective for choosing to attack the more difficult to prove argument, i.e. that petitioner was

23  responsible for the actions of Foley and Cummings.  Moreover, as discussed above, there was

24  substantial evidence that the kidnapping had not ended when McBroome was killed.  Therefore,

25  it is unlikely that the outcome of the trial would have been different had counsel made this

26  argument.  The denial of this claim by the Superior Court was not an unreasonable application of

1    clearly established Supreme Court authority.

2            Petitioner next argues that counsel was ineffective for failing to request an

3    instruction on voluntary manslaughter and corresponding instructions on perfect and imperfect

4    self-defense.  Petition, p. 31.  Petitioner argues that the evidence demonstrated that Cummings

5    killed McBroome in the heat of passion, or as the result of an unreasonable self-defense.  In

6    support of this argument, petitioner cites the portion of the California Court of Appeals' opinion

7    addressing Cummings' claim that the trial erred by failing to sua sponte give these instructions:

8            There was evidence to suggest the kidnapping, if any, had ended. The jury was free to
             accept the evidence that Garcia voluntarily joined Foley, McBroome, and the others
9            inside the house wherein a social gathering had convened and McBroome also voluntarily
             stayed to enjoy the drugs and the company.  When Strain and Cummings arrived,
10           however, the dynamics changed immediately from a friendly party to a hostile
             confrontation.  Cummings knew McBroome had a propensity for violence and that
11           because he abused methamphetamine, he could be volatile.  McBroome, who had stolen
             drugs from his friend, Mueck, was shouting obscenities at Strain, with whom Cummings
12           had apparently begun a relationship.  As the confrontation escalated, Mueck asked
             Cummings to get everyone to leave because her daughters were sleeping in an adjacent
13           bedroom.  Cumulatively, there was evidence from which the jury might infer
             Cummings's passions had become inflamed when McBroome grabbed his mustache.  By
14           then, Cummings may have been so enraged at McBroome's abuse of Strain, theft from
             Mueck, and the assault, that he reacted in a heat of passion.

15
             Alternatively, there was also evidence of unreasonable self-defense.  Cummings was a
16           relative newcomer to this niche in the Redding drug culture.  He had only been released
             from prison for 6 days.  While he did not know McBroome well, he knew he abused
17           methamphetamines.  Moreover, McBroome, at 6'2", was bigger than either Cummings at
             5'11" or Foley at 5'8".  Surrounded by a party of near strangers who had been consuming
18           a variety of drugs, Cummings picked up Foley's gun as a safeguard.  The jury could have
             found that in these volatile circumstances, Cummings believed his life was endangered
19           when McBroome jumped up and pulled his mustache.  Hence, the evidence of both heat
             of passion and unreasonable self-defense is "substantial enough to merit consideration"
20           by the jury.

21   Respondent's Lodged Document No. 4, pp. 31-32.

22           The Court of Appeal went on to find that while the trial court erred by failing to

23   instruct on voluntary manslaughter, the error was invited because at trial Cummings resisted the

24   instruction.  Id., p. 33.

25           In rejecting petitioner's claim that counsel was ineffective for failing to request a

26   manslaughter instruction the Shasta County Superior Court found that such an instruction would

have been inconsistent with petitioner's defense.  Respondent's Lodged Document 18f, p. 5.  The Superior Court also stated,

> Here, it should be kept in mind that, although he refused a voluntary manslaughter instruction, Cummings testified and the jury found him guilty of murder.  It would have been difficult for petitioner's counsel, in this light, to argue that the kidnap he knew nothing of had ended and, therefore, was entitled to a voluntary manslaughter instruction.

Id.

The court is not so sanguine in this regard as the Superior Court.  This is not the situation where a defendant poses a contrast as stark as in a case where only one crime perpetrator was present at the scene, and the proffered defense is "I was not there, but if I were there, this is how it happened."  In arguing both scenarios, defendant's counsel appears disingenuous.  Rather, this is a case where no one disputes that petitioner was not present at the time of the killing, and that his liability, if any, is indirect.  Petitioner could logically argue that he did not know, and should not have known, that a killing would take place, but that in any event, the evidence presented on the killing which occurred, indisputably performed by another, did not rise to the level of murder.

Although the undersigned disagrees with the Superior Court, AEDPA requires a finding of unreasonableness in assessing counsel's performance.  Reasonable persons could disagree on the ability of counsel to effectively argue the manslaughter issue; thus petitioner cannot succeed on the first prong of ineffective assistance.[2]  Because the denial of this claim by the Superior Court was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

---

[2]  It is not necessary to discuss the prejudice prong since counsel has been found to be AEDPA reasonable in his actions.  Suffice it to say here that the prejudice prong is greatly interwoven, in this case, with the reasonableness prong in that if the suggested argument was not AEDPA required, it could not have been AEDPA prejudicial.  Moreover, the jury found petitioner guilty of kidnaping and that a killing occurred in the course of a kidnaping.  Whether that killing might otherwise, in the absence of kidnaping, have been more properly construed as manslaughter is of theoretical interest only.

1    Finally, petitioner argues that counsel was ineffective for failing to object to the

2    court instructing on conspiracy or kidnap for purpose of extortion.  Petition, p. 32.  Petitioner

3    argues that there was no evidence that he conspired or kidnaped for purpose of extortion.  This

4    claim is really further argument in support of petitioner's insufficiency of evidence claim, which

5    the court will address infra.

6              C.  Insufficient Evidence

7    On direct appeal, the California Court of Appeal was the last state court to issue a

8    reasoned decision addressing petitioner's sufficiency of evidence claims.  Respondent's Lodged

9    Documents 4 (appellate opinion) and 5 (summary denial of petition for review by California

10   Supreme Court).  Accordingly, the court considers whether the denial of these claims by the

11   California Court of Appeal was an unreasonable application of clearly established Supreme

12   Court authority.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

13             *Legal Standard*

14   When a challenge is brought alleging insufficient evidence, federal habeas corpus

15   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

16   most favorable to the prosecution, no rational trier of fact could have found "the essential

17   elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

18   319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire record when the

19   sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758 F.2d 441, 448 n.

20   11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483

21   U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

22   evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S.

23   Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable

24   doubt.  It is whether rational jurors could have reached the same conclusion that these jurors

25   reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

26   \\\\\

1    If the trier of fact could draw conflicting inferences from the evidence, the court in

2    its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

3    469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

4    at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

5    trier of fact could have found the conviction scenario beyond a reasonable doubt.

6         In reviewing the sufficiency of the evidence supporting a
          conviction, we search the record to determine "whether a
7         reasonable jury, after viewing the evidence in the light most
          favorable to the government, could have found the defendants
8         guilty beyond a reasonable doubt of each essential element of the
          crime charged."  United  States v. Douglass, 780 F.2d 1472, 1476
9         (9th Cir.1986).  *The relevant inquiry is not whether the evidence
          excludes every hypothesis except guilt, but whether the jury could
10        reasonably arrive at its verdict.*  United States v. Fleishman, 684
          F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct.
11        464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d
          1337, 1343 (9th Cir.1981), overruled on other grounds, United
12        States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

13   United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

14        Superimposed on these already stringent insufficiency standards is the AEDPA

15   requirement that even if a federal court were to initially find on its own that no reasonable jury

16   should have arrived at its conclusion, the federal court must also determine that the state

17   appellate court not have affirmed the verdict under the Jackson standard in the absence of an

18   unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

19        *Analysis*

20        Petitioner argues that there was insufficient evidence to support his convictions

21   for murder, conspiracy to commit assault with a firearm, conspiracy to extort, kidnap for

22   extortion, and the kidnaping of Garcia.

23        The California Court of Appeal rejected the challenge to the kidnaping

24   convictions, on which the murder convictions were based, as follows:

25        Defendants were convicted of kidnapping, murder, and kidnapping for extortion.
          Since kidnapping is at the crux of each of these findings, we begin with the
26        sufficiency of the evidence to support a kidnapping conviction.  "Kidnapping is a

34

substantial movement of a person accomplished by force or fear." (People v. Cortez (1992) 6 Cal.App.4th 1202, 1209.)  The crime continues as long as the detention continues.  (People v. Thomas (1994) 26 Cal.App.4th 1328, 1334.)

All three defendants contend there was no kidnapping because McBroome voluntarily accompanied Foley to Mueck's house.

Gladding and Cummings insist there was insufficient evidence either of them intended to kidnap McBroome or that they conspired to commit a kidnapping or that they aided and abetted the kidnapping.  Neither was present when Folely assertedly forced McBroome at gunpoint to accompany him to Mueck's house. They assert there was no evidence they knew Foley would take McBroome captive, nor was there any evidence the kidnapping was a natural and probable consequence of Foley's drug collection efforts.  They offered so-called expert testimony from a drug dealer who assured jurors that collections within the drug culture are notably peaceful. Finally, they maintain that even if Foley kidnapped McBroome from the parking lot, the kidnapping ended when they arrived at Mueck's house and McBroome and Garcia began to party with the others present.

As mentioned above, jurors are free to believe the account narrated at trial by both Foley and Cummings.  However, they did not.  Instead, they must have drawn the inferences from the evidence presented by the prosecution.  We recap the highlights of the prosecution's story.

The prosecution presented compelling evidence that Gladden spearheaded the operation, albeit from a distance.  He clearly had a motive to teach McBroome a lesson.  Several witnesses testified he was very upset with McBroome for the latter's behavior in front of his ailing grandmother and for failing to repay his drug debt.  He wanted McBroome's "grille taken out" and he commissioned his old buddy, Foley, to collect the debt for him.  Moreover, he promised to pay Foley $1,000 even though the debt itself was only $1,600.

Gladden argues he did not commission Foley to use violence, to kidnap McBroome, or to murder him.  Nor, according to Gladden, were any of these events forseeable or a natural and probable consequence of the conspiracy to extort money from McBroome.  But the jury found otherwise.  There was evidence Foley always carried a firearm and had threatened a victim in the past with violence if he did not pay his drug debt.  A rational trier of fact could surely conclude that in this self-policing business with its own code of retribution and enforcement, a wide assortment of crimes was committed.  In other words, the jury could have decided that Gladden knew Foley would assault and kidnap McBroome if necessary and specifically intended that his friend and collection agent would use all means necessary to even the score. For, after all, he had promised to pay a sizable bounty for Foley's services.  While there may not have been direct evidence Gladden saw Foley with a gun, the jury could reasonably infer Gladden knew Foley would carry a gun to collect the drug money and that since they had been friends since junior high school, each had at least three prior prison terms, and many of their other friends testified Foley was armed.  Far from the unintended and unforeseeable consequences argued by Gladden, we find it was reasonable for the jury to infer that he had conspired, aided, and abetted the commission of the kidnapping.

Gladden insists this result is contrary to our holding in People v. Woods (1992) 8 Cal.App.4th 1570.  We disagree.  We reversed a first degree murder conviction for instructional error, not for insufficiency of the evidence.  We held: "[A]n aider and abettor may be found guilty of a lesser crime than that ultimately committed by the perpetrator where the evidence suggests the ultimate crime was not a reasonably forseeable consequence of the criminal act originally aided and abetted, but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was such a consequence.  Accordingly, even when neccessarily included offense instructions are not required for the perpetrator because the evidence established that, if guilty at all, the perpetrator is guilty of the greater offense, the trial court has a duty to instruct sua sponte on necessarily included offenses for the aider and abettor if the evidence raises a question whether the greater offense is a reasonable forseeable consequence of the criminal act originally contemplated and abetted, but would support a finding that a lesser included offense committed by the perpetrator was such a consequence."  (Id. at pp. 1577-1578.)

Gladden attempts to expand our holding from the context in which it was decided, the failure to instruct sua sponte, to attack the sufficiency of the evidence.  He contends that like Woods, he did not stand in the shoes of the perpetrators.  While he intended Foley to extort money from McBroome, he could not reasonably foresee that he would kidnap him and Cummings would kill him.  This brings us full circle to the same response we have offered to each of the challenges to the sufficiency of the evidence.  The jury was free to accept the inferences urged by the defendants.  It chose not to do so.  Woods does not dictate a different result.

Nevertheless, Gladden and Cummings claim the kidnapping, if any, had ended long before the shooting.  And again, the jury rejected that notion.  Witnesses testified Foley kept a gun on his lap at Mueck's house until Cummings arrived.  On several occasion, he raised the gun and pointed it at either Garcia or McBroome.  He told McBroome he could not leave.  We agree with defendants that in many social circles a kidnapping victim would not party with his assailant, sharing drugs and idle conversation.  But that is not to say that a reasonable juror, educated by witnesses in this case to the upside-down social order induced by methamphetamine and alcohol, could not conclude that McBroome was forced to stay in the house against his will.

*****

Additionally, Gladden contends that no rational juror could have found him guilty of kidnapping Garcia.  Even if he is vicariously liable for the kidnapping of McBroome, he asserts Garcia's kidnapping was completely random, and therefore, unforseeable.  (People v. Luparello, supra, 187 Cal.App.3d at p. 437.)  He ignores culpability as a coconspirator.

Coconspirators are responsible for all acts of their coconspirators for crimes committed in furtherance of the common purpose, even if those acts are unintended or expressly forbidden.  (People v. Zamora (1976) 18 Cal.3d 538, 554.)  The jurors concluded the defendants joined together to use whatever means necessary, including violence, to collect the victim's misbegotten drug money.  Whether the conspiratorial net caught any little fish along with the primary target

36

was a question of fact, resolved in this case against the defendants.  While it may have been just as plausible that the jury would have concluded that the kidnapping of a second victim was not in furtherance of the conspiracy, it was free to decide that it was.  We simply cannot say as matter of law that the kidnapping of someone who accompanied McBroome on his drug rounds was unforeseeable.  In sum, there was sufficient evidence to support each of the kidnapping counts.

Respondent's Lodged Document No. 4, pp. 48-53.

The California Court of Appeal rejected the challenge to the murder conviction as follows:

Defendants echo the refrain there was insufficient evidence they planned, intended, or facilitated a murder.  Rather, they insist, the killing was accidental.  The prosecution argued the killing occurred during the kidnapping, and therefore, each of the defendants as coconspirators or aiders and abettors were guilty of felony murder.  The jury was also instructed on premeditated and deliberate first degree murder.  Again, our task is deferential and straightforward.  Could a rational trier of fact find the killing was committed during the kidnapping?  The answer quite simply is yes.

A killing committed during the commission or attempted commission of a kidnapping is murder of the first degree.  (Pen. Code, § 189.)  "The mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed.  [Citations.] There is no requirement of a strict 'causal' [citation] or 'temporal' [citation] relationship between the 'felony' and the 'murder.'  All that is demanded is that the two 'are parts of one continuous transaction.' [Citation.]  There is, however, a requirement of proof beyond a reasonable doubt of the underlying felony."  (People v. Berryman, supra, 6 Cal.4th at p. 1085.)

We have discussed the sufficiency of the evidence of kidnapping at some length above.  Since there is substantial evidence the forcible detention was ongoing when Cummings shot and killed McBroome, the killing occurred during the perpetration of the predicate or underlying felony, kidnapping.

Defendants argue there is insufficient evidence of the requisite intent for murder when vicarious liability is coupled with the felony murder rule.  We agree land mines checker the field.  If, for example, defendants conspired or aided and abetted an extortion, extortion would be the intended felony.  The question would then arise whether a felony which is committed as the natural and probable consequence of the intended felony can qualify as the predicate felony for purposes of the felony murder rule.  In spite of defendants' protestations to the contrary, these difficult issues do not arise in this case because there is sufficient evidence to support the jury's findings the killing was committed during the course of a kidnapping and defendants intended to commit the offense of kidnapping.  In other words, kidnapping was both the intended felony and the target felony. Defendants have spotted the dangers of coupling vicarious liability with the felony murder rule.  In some cases, the requisite mens rea dissipates

37

because a coconspirator or aider and abettor simply does not intend to commit a life threatening felony. The jury, however, found this was not the case.

Stating their argument as a simple matter of fact, defendants assert the shooting was accidental and therefore could not constitute first degree, premeditated murder. First degree premeditated murder was not the theory emphasized by the prosecutor at trial and the evidence of first degree premeditated murder is not compelling. In any event, the finding of felony murder rests on an even sturdier evidentiary foundation and renders a discussion of first degree premeditated murder unnecessary. (People v. Berryman, supra, 6 Cal.4th at p. 1086.) Nevertheless, we conclude there is sufficient evidence to support the verdict of first degree, premeditated murder despite the presence of contrary evidence supporting the defense accident claim.

Id., pp. 53-56.

Based on the reasoning of the California Court of Appeal, with the exception of a finding of sufficiency of the evidence for premeditated murder, this court finds that there was sufficient evidence to support petitioner's convictions for murder and the kidnap of Garcia.[3] It is important to remember that the sufficiency of the foreseeability is not whether petitioner should have predicted the precise methodology of the killing, a methodology complicated by the fact that petitioner's hired "collector" was not the person who performed the shooting. If this were the test, a reasonable person would be hard pressed to have predicted the victim's demise at the hands of a third party (Cummings) who may have shot precisely at the time he did because his moustache was pulled. Rather, the focus remains on the danger which is inherently present when one retains a collector to violently, if necessary, collect on a drug debt. Kidnapings happen in such circumstances, and the potential for violence at whoever's hands escalates during a kidnaping. Sufficient evidence existed that the murder of the victim was a foreseeable act of the drug collection/kidnaping.

\\\\\

---

[3] As did the Court of Appeal, the undersigned finds that there is no necessity to discuss the alternative first degree murder theory of premeditated murder. Adding another, overlapping theory of first degree murder did not affect petitioner's sentence. However, on this court's analysis, there does not appear to be any direct evidence of premeditation, and there do not appear to be sufficient reasonable inferences for the jury to have found premeditated murder.

The California Court of Appeal rejected the claim that there was insufficient evidence to support the convictions for conspiracy to kidnap for extortion and conspiracy to commit assault with a deadly weapon:

Gladden asserts there was insufficient evidence he conspired or aided and abetted an assault with a deadly weapon or a kidnapping to extort money from McBroome to satisfy his drug debt. His argument differs only slightly from his challenge to the sufficiency of the evidence to support the kidnapping conviction. His role in the kidnapping and murder closely resemble that of his counterpart in People v. Luparello, supra, 187 Cal.App.3d 410. Because there is ample evidence of both theories of vicarious liability, Gladden was properly convicted of assault with a deadly weapon and kidnapping for extortion.

Luparello had been "a learned and professional man in his mid-30's" (id. at p. 447) with a nonviolent background when his girlfriend reconciled with her husband, and left him coping with his own divorce. Apparently distraught, he enlisted the help of several of his chiropractic patients to help him find his girlfriend. He believed a friend of his girlfriend's husband would know their whereabouts and he hired a trio to get information from the friend. He remarked that, "he would like the information at any cost." (Id. at p. 419.) The trio was carrying assorted weapons. Luparello did not accompany them when they went to the friend's house to obtain the information. They enticed the friend to come out of the house and someone sitting in a parked car fired six shots. The victim died. Luparello was tried as a coconspirator and an aider and abettor. A jury convicted him of conspiracy to commit an assault by means of force likely to produce great bodily injury and murder.

Luparello raised many of the same arguments raised here and premised on the notion he could not be held liable for a murder he did not intend. The court rejected those arguments explaining the broad scope of vicarious liability as either a conconspirator or an aider and abettor. "[A] conspirator is criminally liable for the act of a coconspirator which follows as a probable and natural consequence of the common design, even though it was not intended as a part of the original design or common plan." (Id. at p. 442.) "'[T]he aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable consequences of any act that he knowingly aided or encouraged...' [Citation.]" (Id. at p. 445.)

Gladden, like Luparello, was not present while the underlying offenses were committed. But there was certainly substantial evidence he set in motion the entire operation. While operation may connote a more finely tuned organization than any of the participants in this collection effort ever envisioned or experienced, it was Gladden who hired Foley to collect the debt and take McBroome's grille out, aware, as was Luparello, that his agent was armed. He stood ready to compensate Foley generously for his services, and in fact, he continued to help Foley financially following the shooting. There was substantial evidence he not only conspired with Foley to collect the debt by whatever means necessary but he actively assisted that effort by remunerating his coconspirators

for their efforts.  As in Luparello, the assault was a natural and probable consequence of hiring armed thus to help out.  Both the assault and the kidnapping for extortion are well insulated from a reversal for lack of sufficiency of the evidence.

Foley and Gladden add an additional twist to the argument. They claim their kidnapping for extortion conviction is infirm because there was insufficient evidence there was a second victim from whom the perpetrator attempted to extract something of value.  Kidnapping for extortion does not require the person extorted be someone other than the kidnapped victim.  (People v. Ibrahim (1993) 19 Cal.App.4th 1692, 1693; People v. Superior Court (Deardorf) (1986) 183 Cal.App.3d 509, 513-514.)  We agree with the rationale set forth in Ibrahim wherein the court concluded that the four descriptive examples provided in the earlier cases of People v. Martinez (1984) 150 Cal.App.3d 579, all of which included more than one victim, were not meant to be exclusive.  A second victim is not an element of the crime of kidnapping for extortion.

Id., pp. 56-58.

Based on the reasoning of the California Court of Appeal, this court finds that there was sufficient evidence to support petitioner's convictions for conspiracy to kidnap for extortion and conspiracy to commit assault with a deadly weapon.

The California Court of Appeal rejected petitioner's argument that there was insufficient evidence to support the convictions for conspiracy to extort and conspiracy to commit assault with a firearm because he could only have been convicted of a single conspiracy:

"[W]here the evidence shows that a group of conspirators agreed to commit a number of different crimes incidental to a single objective, there is only one conspiracy, and convictions for multiple conspiracies cannot be sustained.  (People v. Lopez (1994) 21 Cal.App.4th 1551, 1557-1559 [].)"  (People v. Lui (1996) 46 Cal.App.4th 1119, 1133.)  Relying on this principal, Gladden argues that he and his coconspirators had a single common purpose–to collect McBroome's drug debt–and thus only a single conviction of conspiracy can stand; he thus cannot be convicted of both conspiracy to commit extortion and conspiracy to commit assault with a firearm.

The argument falters on evidence that Gladden and his coconspirators had multiple objectives.  Certainly debt collection was an objective, but it was not the only objective.  Punishment for past misdeeds, including disrespect for Foley, was another objective.  As previously observed, McBroome raised the ire of Gladden and others based on various insults and indiscretions.  The conspirators sought to not only receive payback from McBroome for his drug debt, but to inflict "payback" for his misconduct.  The conspiracy to commit extortion secured the first objective; the conspiracy to commit assault with a firearm facilitated the second objective.

40

1   Id., pp. 60-61.

2           Based on the reasoning of the California Court of Appeal, this court finds that

3   petitioner's argument that he could only be convicted of a single conspiracy is without merit.

4           The denial of petitioner's claims challenging the sufficiency of the evidence by

5   the California Court of Appeal was not an unreasonable application of clearly established

6   Supreme Court authority.  Accordingly, these claims should be denied.

7                   D.  Right to Confrontation

8           Petitioner argues that he was denied his right to confront witnesses because the

9   trial court admitted hearsay statements of McBroome's mother, Bonnie Moore.  While petitioner

10  raised this claim on direct appeal, the California Court of Appeal did not address this claim in its

11  reasoned opinion.  See Respondent's Lodged Document No. 4.  Petitioner raised this claim in his

12  petition for review to the California Supreme Court.  Respondent's Lodged Document no. 13.

13  Accordingly, this court independently reviews the record to determine whether the California

14  Supreme Court's summary denial of the petition for review was an unreasonable application of

15  clearly established Supreme Court authority.  See Respondent's Lodged Document No. 17

16  (summary denial of petition for review by California Supreme Court).

17          The background to this claim is set forth in the opinion of the California Court of

18  Appeal:

19          McBroome's mother testified McBroome told her a day or two before he died that
            he was afraid he would be killed if he did not pay his drug debt.  Defendants argue
20          the evidence was improperly admitted as state-of-mind evidence and it was
            substantially more prejudicial than probative.  We disagree.
21
            Evidence Code section 1250 renders statements of a declarant's then existing state
22          of mind admissible when offered to prove or explain act or conduct of the
            declarant.  Here McBroome's statement he was afraid he would be killed was
23          relevant to an issue hotly contested at trial: whether he voluntarily accompanied
            Foley from the parking lot of the apartments to Mueck's house.  The statements
24          were admissible under section 1250.

25  Respondent's Lodged Document 4, pp. 66-67.

26  \\\\\

1      Petitioner cites <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354 (2004) in

2 support of this claim.  In <u>Crawford</u>, the Supreme Court held that an out-of-court testimonial

3 statement may not be admitted against a criminal defendant unless the declarant is unavailable

4 and the defendant had a prior opportunity to cross-examine the declarant. Respondent argues that

5 petitioner's <u>Crawford</u> claim is unexhausted because he did not present it to the California courts.

6 In <u>Whorton v. Bockting</u>, 127 S.Ct. 1173 (2007), the Supreme Court held that <u>Crawford</u> does not

7 apply retroactively on collateral review.  Therefore, the court need not address respondent's

8 exhaustion argument and will apply the standard in effect prior to <u>Crawford</u> for analyzing

9 Confrontation Clause claims.

10      Admission of a hearsay statement does not violate a defendant's Sixth

11 Amendment rights if 1) the statements falls within a firmly-rooted hearsay exception; or 2) it

12 contains particularized guarantees of trustworthiness.  <u>Lilly v. Virginia</u>, 527 U.S. 116, 124-25,

13 119 S.Ct. 1887 (1999) (citing <u>Ohio v. Roberts</u>, 448 U.S. 56, 66, 100 S.Ct. 2531 (1980)).

14      A hearsay exception is firmly rooted "if, in light of 'longstanding judicial and

15 legislative experience,' [citation], it 'rest[s] [on] such [a] solid foundatio[n] that admission of

16 virtually any evidence within [it] comports with the 'substance of the constitutional protections.'

17 [Citations.] This standard is designed to allow the introduction of some statements falling within

18 a category of hearsay whose conditions have proven over time 'to remove all temptation to

19 falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath'

20 and cross-examination at trial. [Citation.]" <u>Lilly</u>, 527 U.S. at 126, 119 S.Ct. 1887.  "[W]hether

21 the statements fall within a firmly rooted exception for Confrontation Clause purposes is a

22 question of federal law." <u>Id.</u> at 125, 119 S.Ct. 1887.  If, as in <u>Lilly</u>, the proferred statement is

23 inherently unreliable and falls outside a firmly rooted hearsay exception, the prosecution must

24 satisfy the second prong of the <u>Roberts</u> test in order to introduce the statements.  <u>Id.</u> at 131, 119

25 S.Ct. 1887.

26 \\\\\

1    The Evidence Code section 1250 state of mind exception to the hearsay rule is

2    firmly rooted in California's decisional and statutory law.   See West's Ann. Evid. Code (1995

3    ed.) foll § 1250, pp. 280-281; People v. Morales, 48 Cal.3d 527, 552, 257 Cal.Rptr. 64 (1989).

4    Accordingly, admission of Bonnie McBroome's testimony did not violate the Confrontation

5    Clause.

6    Because the denial of this claim by the California Supreme Court was not an

7    unreasonable application of clearly established Supreme Court authority, this claim should be

8    denied.

9    Accordingly, IT IS HEREBY RECOMMENDED that:

10    1.  Respondent's August 4, 2006, motion to amend the answer be denied;

11    2.  Petitioner's application for a writ of habeas corpus be denied.

12    These findings and recommendations are submitted to the United States District

13    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14    days after being served with these findings and recommendations, any party may file written

15    objections with the court and serve a copy on all parties.  Such a document should be captioned

16    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17    shall be served and filed within ten days after service of the objections.  The parties are advised

18    that failure to file objections within the specified time may waive the right to appeal the District

19    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20    DATED: 4/25/07

21                                              /s/ Gregory G. Hollows

22                                              _____
                                               GREGORY G. HOLLOWS
                                               UNITED STATES MAGISTRATE JUDGE

23

24    gladden.157

25

26

43